# 11 CIV 7715

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of itself and all others similarly situated,<br><br>              Plaintiffs,<br>    vs.<br><br>BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC, CITIBANK NA, DEUTSCHE BANK AG, HBOS plc, HSBC HOLDINGS PLC, JPMORGAN CHASE & CO., LLOYDS BANKING GROUP PLC, UBS AG, and WESTLB AG,<br><br>              Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff City of New Britain Firefighters' and Police Benefit Fund, on behalf of itself and all others similarly situated, brings this action against defendants Bank of America Corporation, Barclays Bank plc, Citibank NA, Deutsche Bank AG; HBOS plc, HSBC Holdings plc, JPMorgan Chase & Co., Lloyds Banking Group plc, UBS AG, and WestLB AG (collectively, "Defendants") and alleges as follows:

## NATURE OF CLAIM

1.    This action arises from Defendants' conspiracy to unlawfully manipulate the London Interbank Offered Rate for the U.S. Dollar ("LIBOR") from August 1, 2007 through such time as the effects of Defendants' illegal conduct ceased, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

2.    Plaintiff and members of the Class are purchasers of interest rate swaps sold by the Defendants pursuant to which Plaintiff and members of the Class agreed to accept future payments based upon the reported U.S. Dollar LIBOR rate. Interest rate swaps are, generally, contractual arrangements to exchange, or swap, a variable rate stream of cash flow for a fixed rate of cash flow based on a defined notional amount for a pre-determined period of time. Plaintiff and members of

82565095.1                             1

the Class made payments based on fixed rates of interest which they had exchanged or swapped for a variable rate of interest based on LIBOR.

3.      As alleged herein, Defendants conspired to and did suppress and manipulate LIBOR throughout the Class Period (defined below). Because Defendants regularly transacted billions of dollars annually in interest rate swaps for which their payment obligations were based on LIBOR, they could benefit substantially by colluding to suppress LIBOR and entering into such swaps.

4.      Owned and administered by the British Bankers Association ("BBA"), LIBOR is a daily benchmark interest rate based on the trimmed average of interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale money market for maturities ranging from overnight to one year. LIBOR is calculated for 10 different currencies. As applied to the U.S. Dollar, LIBOR is calculated for various tenors (borrowing durations), ranging from overnight to twelve months.

5.      Every morning by 11:10 a.m. London time, the individual banks on the U.S. Dollar LIBOR Panel send data to Thompson Reuters Group ("Reuters"), a news information provider reporting what it would cost them to "borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time." The result is then reported by Reuters as that day's LIBOR for the particular tenor in question. Rates for the U.S. Dollar LIBOR are computed based upon data submitted by a number of banks hereafter referred to as the U.S. Dollar LIBOR Panel. Prior to February 2011, 16 banks sat on the U.S. Dollar LIBOR Panel, and Reuters determined LIBOR by discarding the lowest four and highest four of the reported estimates and calculating the average of the remaining eight. In February 2011, the panel size was increased to 20 banks and Reuters now calculates LIBOR from the rates provided by eliminating the five highest and five lowest rates and averaging the remaining 10.

6.     Throughout the Class Period, Defendants were members of the U.S. Dollar LIBOR Panel. Pursuant to their illegal conspiracy, Defendants knowingly and purposely submitted borrowing rates to Reuters that were below their true borrowing costs in order to suppress and manipulate LIBOR.

7.     Throughout the Class Period, Defendants sold interest rate swaps through which they agreed to make payments based on LIBOR in exchange for receiving payments calculated as a fixed rate of return.  By suppressing and manipulating LIBOR, Defendants suppressed the amount they would have to pay on these instruments, while leaving the amount they would receive unchanged.

8.     Defendants' manipulation of LIBOR directly caused and resulted in an artificially lower U.S. Dollar LIBOR rate for all tenors during the Class Period.

9.     Defendants' conspiracy to suppress LIBOR violates Section 1 of the Sherman Act, 15 U.S.C. §1.  Plaintiff and members of the Class suffered damages by purchasing directly from Defendants during the Class Period interest rate swaps that had rates of return tied to LIBOR ("LIBOR-Based Derivatives"), as more fully alleged herein.

<u>JURISDICTION AND VENUE</u>

10.     This action arises under Section 1 of the Sherman Act, 15 U.S.C., §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

11.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

12.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d). One or more of the Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

13.     During the Class Period, Plaintiff City of New Britain Firefighters' and Police Benefit Fund ("New Britain") purchased one or more interest rate swaps from a Defendant.  New Britain is pension fund located in Connecticut with the mission of providing retirement benefits to the city's employees and their spouses.

14.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina. During the Class Period, Bank of America was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

15.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England. During the Class Period, Barclays was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

16.     Defendant Citibank NA ("Citibank") is a wholly-owned subsidiary of the United States financial services corporation Citigroup, Inc., which is headquartered in New York, New York. During the Class Period, Citibank was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

17.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  During the Class Period, Deutsche Bank was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

18.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public company with its corporate headquarters in London, England.  During the Class Period, HSBC was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

19.     Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware financial holding company headquartered in New York, New York. During the Class Period, JPMorgan was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

20.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company with its corporate headquarters in London, England. Lloyds was formed in 2009

through the acquisition of HBOS plc ("HBOS") and Lloyds TSB Bank plc ("Lloyds TSB"). During the Class Period, both HBOS and Lloyds TSB were members of the British Bankers' Association's U.S. Dollar LIBOR Panel.

21.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland. During the Class Period, UBS was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

22.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany. During the Class Period, WestLB was a member of the British Bankers' Association's U.S. Dollar LIBOR Panel.

UNNAMED CO-CONSPIRATORS

23.     Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements which aided and abetted and was in furtherance of the unlawful conduct alleged herein, including other members of the British Bankers' Association's U.S. Dollar LIBOR Panel.

## THE RELEVANT MARKET

24.     LIBOR is a benchmarking product created (with regard to the U.S. Dollar) exclusively from the reports of Defendants and the other banks acting as members of the U.S. Dollar LIBOR Panel.  As a benchmark, or reference rate, LIBOR itself is neither bought nor sold, but numerous financial products based upon it are routinely bought and sold by Defendants and the other banks acting as members of the U.S. Dollar LIBOR Panel.  These products are frequently referred to as 'derivatives' because they are explicitly based upon (derived from) the underlying LIBOR rate. Globally, the total notional amount of interest rate swaps outstanding has been reported as $364.378 trillion USD as of December 2010.

25.     Benchmarking products provide an ideal mechanism for coordinated price manipulation.  They allow a group of horizontally aligned competitors to set a single price that they

know will be broadly adopted, without necessarily having to communicate directly with each other. Benchmark products such as LIBOR are promoted based on the soundness of the methodology used to compute them, and are not subject to verification by parties (including Plaintiff and members of the Class) who enter into transactions based upon the benchmark.  As a result, LIBOR provides the appearance of transparency (through reporting an average of borrowing rates purportedly incurred by member banks), but in fact is entirely opaque – given the inability to identify or verify interbank borrowing rates attributable to individual banks.

26.     In publishing LIBOR as a benchmark rate, Defendants and alleged co-conspirators know and intend that this rate will be used as the basis for pricing financial products, including interest rate swaps, which they regularly buy and sell.  Because the net return on such instruments is calculated directly and formulaically based upon the published LIBOR rate, the dollar amount that counterparties (such as Plaintiff and other Class members) will lose and the Defendants will gain from rate manipulation is predictable and readily calculated.  It provides direct evidence of anti-competitive injury.  Indeed, the purchase and sale of interest rate swaps (rather than the LIBOR benchmark itself) gives rise to economic injury, and is the first market in which LIBOR is, in fact, transacted.  Plaintiff and other members of the Class are direct purchasers.

27.     Given that Defendants engaged in *per se* illegal conduct, defining a relevant market is not necessary.  Moreover, the principal purpose of a relevant market definition is to determine the feasibility of alleged price manipulation or other collusive conduct.  It is clear, as alleged herein, that Defendants had the ability (through under-reporting their own borrowing costs) to artificially suppress LIBOR and that such activities would have been nearly impossible to detect.  Further, because LIBOR is promoted as a true and correct reporting of current interest rate conditions, those entering into interest rate swaps based upon LIBOR would have had no reason to seek or enter into alternatives – LIBOR is routinely applied as the basis for U.S. interest rate swaps, and there are few options available to those not wishing to transact based upon LIBOR.  Banks and broker dealers transacting in interest rate swaps do not compete against each other regarding the LIBOR rate itself,

which is a fixed element of the transaction.  As a result, Defendants and their alleged co-conspirators were able to increase the amounts they would receive and/or decrease the amounts they would have to pay on interest rate swaps they sold to Plaintiff and other Class members by manipulating the LIBOR rate itself.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Class" is defined as:

> All persons or entities (other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators, whether or not named in this Complaint) who between August 1, 2007 and the present date (or such earlier date as the effects of Defendants' illegal conduct ceased) entered into one or more interest rate swaps directly with Defendants, (or their subsidiaries and/or affiliates) in which the payment to be received from Defendants was calculated based on U.S. Dollar LIBOR, while the payment to be made to Defendants was calculated based on a fixed rate of interest.

29.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least tens of thousands of geographically dispersed Class members purchased interest rate swaps during the Class Period which complied with the class definition.

30.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the antitrust laws as alleged herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

7

32.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants conspired with others to artificially suppress LIBOR in violation of the Sherman Act;

(b)     Whether Defendants' conduct had an anticompetitive and manipulative effect on LIBOR during the Class Period;

(c)     Whether Defendants' conduct negatively affected the rates of return on LIBOR-based interest rate swaps purchased directly from the Defendants during the Class Period; and

(d)     The appropriate measure of damages for the injury sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

33.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

34.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are often not great enough individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

**I.**  **Background**

**A**  **Overview of LIBOR**

35.    Administered and owned by the BBA, LIBOR is a daily benchmark interest rate based on the trimmed average of interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale money market for maturities ranging from overnight to one year.  LIBOR is calculated for 10 different currencies.

36.    Every morning by 11:10 a.m. London time, the individual banks on the U.S. Dollar LIBOR Panel send data to Reuters, a news information provider reporting what it would cost them to "borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time." Reuters makes those rates public, which constitutes the day's LIBOR. Prior to February 2011, 16 banks sat on the U.S. Dollar LIBOR Panel and Reuters determined LIBOR by discarding the lowest four and highest four of the reported estimates, and calculating the average of the remaining eight. In February 2011, the panel size was increased to 20 banks, and Reuters now calculates LIBOR from the rates provided by eliminating the five highest and five lowest rates and averaging the remaining 10.

**B.**  **LIBOR-Based Derivatives**

37.    LIBOR is the primary benchmark for short-term interest rates globally.

38.    According to the BBA, "the objectivity and accuracy of the [LIBOR] rates allowed derivatives to be created based on the data as a reference, and this has flourished to become an enormously successful cornerstone of business transacted in London and worldwide."

39.    The perceived integrity of LIBOR allows derivative products to be priced based on LIBOR, and trillions of dollars worth of financial products globally reference LIBOR. To the extent that LIBOR is mispriced, these products are also mispriced.

40.    A large portion of the financial products priced based on LIBOR are interest rate swaps of the type entered into by Plaintiff.  The following discussion of the mechanisms of interest rate swaps provides an example of how the LIBOR manipulation affected the derivatives market.

41.    An interest rate swap is a contract between two parties (called counterparties) whereby they exchange differently calculated interest payments on the same principal sum (also known as the notional value).  One of the two counterparties agrees that it will pay a fixed rate of interest on the notional value, and the other agrees that it will pay a variable rate of interest, typically based upon LIBOR.  The two obligations are netted against each other at the end of the term or on periodic settlement dates, and the party with the larger payment obligation is required to remit the difference.  The swap offers a mechanism for those who already face interest rate exposure on debt that they owe or hold to convert the nature of that risk.

42.    Interest rate swaps are transacted in what is referred to as the over-the-counter (OTC) market, typically using standard form documentation published by the International Swaps and Derivatives Association (known as ISDA). Although terms are subject to negotiation, LIBOR is typically accepted as the benchmark used to calculate payments owing on the variable leg of the swap transaction.  Parties must agree on which of the LIBOR tenors to apply (one-month, three-month, etc.), as well as  the size of any premium or deduction necessary to make it equivalent to the fixed rate payment for which it is being swapped and to account for any risk that the counterparty may default on its obligations.  These premiums or deductions do not affect the LIBOR rate itself, which is the key determinant of the variable payment to be made under the swap.  To the extent that LIBOR was artificially suppressed during the Class Period, Plaintiff and each Class Member would have been injured in the amount of that suppression multiplied by the notional amount of the swap contract times the period over which the swap agreement was outstanding.

II.     **Defendants Unlawfully Conspired to Suppress and Manipulate LIBOR**

43.     In August, 2007, LIBOR began a period in which it dramatically decoupled from other financial indicators to which it had historically been linked.  Reports initially assumed that this change was attributable to low liquidity and increased credit risk endemic to the prevailing financial crisis.  However, subsequent examination has revealed that these changes were attributable to Defendants and their co-conspirators acting collusively to manipulate and artificially lower LIBOR.  This conclusion is supported not only by the fact that LIBOR ceased to correspond rationally with other well-recognized economic indicators, but also by specific evidence of inconsistencies in the information Defendants supplied to Reuters regarding their available rate of borrowings.

A.     **The Defendants' Unlawful Manipulation of LIBOR**

44.     2007 was a year characterized by severe illiquidity in the U.S., with banks reluctant to make loans and with ongoing fears of bank failures and possible default.  Historically, such periods have given rise to high LIBOR rates as banks demand larger interest payments (even from each other) as a condition of loaning their funds.  By December 11, 2007, the Federal Reserve had cut short-term interest rates for the third time that year in an effort to help ease the credit crunch and reduce the chances of an impending recession.  The Wall Street Journal ("Journal") published an article the next day predicting that continued worry over the credit crisis would effectively keep LIBOR rates high, even as other short-term interest rates would continue to fall. The article quoted industry sources as stating that historically, in times of credit crisis, LIBOR rates have tended to spike.

45.     Despite the Journal's prediction, in the early months of 2008, during the most significant financial crisis since the great depression, U.S. dollar-denominated LIBOR rates submitted by panel banks did not vary markedly, and neither increased nor decreased sharply. In a market not artificially manipulated, LIBOR rates should have increased significantly during this period in response to the perception of greater credit risk and extreme illiquidity. In addition, because the panel banks reporting for different regions of the world were experiencing markedly different levels of economic stress,

they should have been reporting markedly different borrowing rates. None of this was reflected in LIBOR rates reported by Defendants.

46.    On April 16, 2008, the Journal published an article detailing the findings of a three-month study it conducted into the borrowing rates of the 16 banks forming the U.S. Dollar LIBOR Panel. The Journal concluded that a number of banks – specifically Citibank, WestLB, HBOS, JPMorgan and UBS – had been reporting significantly lower borrowing costs than what other market measures suggested they realistically faced. The Journal attributed this disparity to certain panel banks intentionally understating their borrowing rates.

47.    The Journal's examination of the borrowing costs submitted by the panel banks during the first four months of 2008 indicated that the individual panel banks reported remarkably similar borrowing rates despite the fact that they faced very different financial stresses.  For the first four months of 2008, for example, the three-month borrowing rates reported by the panel banks remained, on average, within a range of only .06 of a percentage point.

48.    According to Professor Darrell Duffle, a Stanford University finance professor, the reported rates during the first four months of 2008 "[were] far too similar to be believed."

49.    David Juran, a statistics professor at Columbia University who reviewed the Journal's methodology, concluded that the Journal's calculations demonstrate "very convincingly" that reported LIBOR rates were lower than what the market thought they should be by a factor which well surpassed the threshold statisticians use to assess the significance of a result.

50.    Following the Journal's April 16, 2008 report that the panel banks may be intentionally understating their borrowing rates, the BBA announced that it would review LIBOR reporting processes and remove from the panel any bank found to be reporting inaccurate rates.

46.    In November 2007 and again in April 2008, the Money Market Committee of the Bank of England raised questions about the integrity of LIBOR. The minutes of the Committee's November 2007 meeting stated that, "several group members thought that Libor fixings had been

lower than actual traded interbank rates." Minutes from the April, 2008 Committee meeting noted that "U.S. dollar Libor rates had at times appeared lower than actual traded interbank rates." Citigroup interest-rate strategist Scott Peng raised similar concerns, writing that "Libor at times no longer represents the level at which banks extend loans to others."

47.     On April 17, 2008, just days after the Journal published its analysis, there was a sudden jump in the U.S. Dollar-denominated LIBOR. For example, the three-month LIBOR jumped to 2.818%, a .084 percentage point increase over the prior day's reported rate of 2.734%. The next day, the three-month LIBOR rose to 2.908%, a further jump of .09%. As a result, the three-month LIBOR rose almost .18% in just two days.

48.     Suspiciously, reported LIBOR rates for other currencies fell or remained relatively flat at the time the U.S. Dollar LIBOR surged, a sign that the U.S. Dollar LIBOR rate was susceptible to manipulation.

49.     Notably, the significant move in the U.S. Dollar-denominated LIBOR closely followed the BBA's announcement that it was accelerating its inquiry into the daily borrowing rates that banks provide to establish LIBOR rate.

50.     The BBA's decision to speed up its inquiry was made in response to concerns expressed by bankers and the financial media that certain panel banks were not accurately reporting the rates they were paying for short-term loans.

51.     In an April 2008 note to clients (the day after the sudden increase in the U.S. Dollar LIBOR), UBS strategist William O'Donnell suggested that the panel banks were responding to the heightened scrutiny, noting that the BBA's announcement of its inquiry was an attempt "to bring publicly posted rates back into line with the shadow interbank money rate market."

52.     At the time, William Porter, credit strategist at Credit Suisse, said he believed the three-month U.S. Dollar LIBOR was .4 percentage points below where it should be. That echoed

the view of Scott Peng of Citigroup, who concluded that the reported LIBOR rates understated panel banks' true borrowing costs by as much as .3 percentage points.

**B.    Empirical Evidence Confirms Defendants' Manipulative and Conspiratorial Conduct**

53.    The method by which panel banks determine their own borrowing costs to report to Reuters is entirely opaque.  As a result, the accuracy of the reported rates cannot be evaluated by the public.  This renders LIBOR susceptible to manipulation by Defendants.

54.    Since the initial media reports of LIBOR manipulation, various empirical studies have demonstrated that the aberrant behavior of LIBOR during the Class Period is suggestive of collective agreement among Defendants to manipulate and suppress the reported rate.  During the Class Period, LIBOR deviated dramatically from its historic relationships with other economic indicators. This sudden and dramatic variation is consistent with the fact that LIBOR was in fact being manipulated by Defendants, as opposed to accurately reflecting true inter-bank borrowing costs.

**1.    LIBOR Diverges From Its Historical Relationship With The Eurodollar**

55.    Eurodollar is a term used to describe U.S. Dollar-denominated time deposits which are located in foreign banks or in foreign branches of U.S. banks.  The interest rate paid on these deposits for particular durations (*e.g.*, overnight, one-month, three-month) is commonly viewed as the best market proxy for the LIBOR and historically the two have been closely correlated.  Eurodollars are actively traded globally and their market rates are therefore readily observable.  An analysis conducted by Connan Snider, a Professor at UCLA and Thomas Youle ("Snider and Youle"), emphasized that, prior to August 2007, the previous day's Eurodollar bid rate was a better predictor of LIBOR than the previous day's LIBOR.

56.    Historically, the difference between LIBOR and the Eurodollar rate, known as the LIBOR/Eurodollar spread (effectively LIBOR minus the Eurodollar bid rate), averages 2.75

basis points (equivalent to 0.0275%).[1] The spread has generally been positive, meaning the Eurodollar rate is slightly lower, reflecting the measurement of LIBOR as an offer rate and the Eurodollar rate as a bid rate on U.S. Dollar deposits. After August 2007, Defendants' manipulation and suppression of LIBOR resulted in a radical decoupling of LIBOR and the Eurodollar rate, and a reversal of the relationship so that the spread was negative.  In the post manipulation period, the average spread was -24.70 basis points as compared with a positive spread of just 2.75 basis points in prior periods

57.     This change in the historical relationship to the Eurodollar is evidence of the downward manipulation of LIBOR. In effect, LIBOR reported that banks were offering Eurodollars at a rate lower than market participants were actually buying them, a result that strongly indicates that Defendants manipulated LIBOR.



---

[1]     A "basis point" is a term commonly used to measure a financial instrument's interest rate.  It is equal to 1/100th of 1 percent, and is useful because daily rate changes are typically smaller than 1 percent, though they still have huge financial effects.

58.     When Snider and Youle performed the identical analysis for the period after August 2007, they found that the previous day's Eurodollar rate had less predictive power on LIBOR.  In fact, as LIBOR dropped below the Eurodollar rate, the previous day's LIBOR became a better predictor of the current LIBOR. This demonstrates that LIBOR was no longer responding to market forces, but instead was the product of Defendants' manipulation.

### 2.     LIBOR Diverges From Its Historical Relationship With Credit Default Swaps

59.     A credit default swap ("CDS") is a derivative instrument through which the buyer acquires, and the seller agrees to provide, protection against the possibility of credit default by a particular obligor or on a particular debt. The fee paid by the purchaser (also referred to as the CDS spread) serves as a measure of the seller's perceived risk of default by the entity whose performance is effectively being guaranteed. The greater the risk of default on the underlying instrument (typically a bond or loan) the greater the spread.  This same concept applies to CDS instruments used to guarantee interbank loans made to panel banks that report their borrowing rates to Reuters for the computation of LIBOR. The greater the perceived risk that the panel bank will default on the loan, the higher its CDS spread.

60.     CDSs are a useful benchmark for LIBOR because both CDSs and LIBOR are a measure of perceived credit risk. On May 29, 2008, Carrick Mollenkamp and Mark Whitehouse ("Mollenkamp and Whitehouse") published an article in the Journal, emphasizing significant disparities between the assessment of certain panel banks' credit risk as reflected in the CDS market and their LIBOR reporting.  A higher CDS spread is indicative of a larger perceived risk in lending to an institution because it represents the cost of insuring against a default on that loan.  However, higher CDS spreads for certain panel banks were found not to correspond with higher borrowing rates reported for LIBOR purposes.

61.     In their analysis, which followed Mollenkamp and Whitehouse, Snider and Youle performed two separate comparisons between LIBOR and CDSs to highlight inconsistencies in LIBOR reporting. First, they noted that a specific reporting bank may have a comparatively

higher CDS spread than a second reporting bank (and therefore be perceived as comparatively "riskier"), while simultaneously having a lower LIBOR than the same bank (which would indicate that it is perceived as a "less risky" investment). For example, Citigroup consistently has a substantially higher CDS spread than the Bank of Tokyo-Mitsubishi, yet Citigroup reported comparatively lower LIBOR quotes. Mollenkamp and Whitehouse also noted the same pattern.

### C.    Inconsistencies With LIBOR Reporting By Individual Banks

62.    A close examination of the borrowing rates reported by Defendants to Reuters for calculation of LIBOR during the Class Period provides further evidence of Defendants' conspiracy to manipulate and suppress LIBOR. For example, Alexandre Harthieser of ESCP Europe and Natixis Bank and Phillippe K. Spieser, Professor of Finance at ESCP Europe, performed clustering analysis on the panel members' individual reporting and concluded that "a suspect cartel has been identified."

### 1.    Panel Banks Report Inconsistent Rates Across Currencies

63.    Panel banks report LIBOR across different currencies each day. Since LIBOR is a measure of a bank's stability as an institution, absent manipulation, the comparative ranking of panel banks should largely be the same across different currencies (allowing for the variation in panel composition across currencies). A comparison of LIBOR across different currencies shows this was not consistently so during the Class Period.

64.    For example, Bank of America and Bank of Tokyo-Mitsubishi both report rates to Reuters for calculation of the U.S. Dollar and Yen LIBOR. However, during the Class Period, it was common for Bank of America to quote a lower rate than Bank of Tokyo-Mitsubishi in U.S. Dollar LIBOR, while simultaneously quoting a higher quote in the Yen LIBOR. Since institutional risk should be the same for each panel bank regardless of the currency in which it is measured, this indicates that the rates being reported did not accurately reflect market conditions and were the likely product of manipulation.

### 2.     Bunching

65.     Throughout the Class Period, the rates reported by certain Defendants "bunch" around the fourth lowest quote each day. That is to say, that the rates reported by those Defendants to Reuters were consistently near the fourth lowest of the 16 panel banks. Since Reuters, at the time, calculated LIBOR by removing the lowest (and highest) four reported rates every day, bunching around the fourth lowest rate is suggestive that those Defendants collectively acted and colluded to suppress and manipulate LIBOR.

66.     As an initial matter, bunching among Defendants' reported rates demonstrates that Defendants intended to report the same or similar rates. Individual variation in the financial circumstances of each reporting bank should lead to differences in their reported rates.  The fact that, throughout the Class Period, Defendants repeatedly reported identical rates to Reuters is an indication that the Defendants were conspiring to manipulate LIBOR. The chart below, for example, indicates that, in late 2008, Bank of America, UBS and Citibank reported nearly identical rates to borrow dollars for three months.



67. Further, certain Defendants' consistent bunching of their reported rates at or near the fourth lowest position is suggestive of their intent to artificially suppress LIBOR. This is because the fifth lowest quote is the lowest quote that is included by Reuters in calculating the day's LIBOR. Defendants' clustering at or near the fourth lowest rate ensures that the artificially low rates reported by Defendants will be included in the BBA's daily calculation resulting in the artificial suppression of LIBOR.

68. The following charts of daily U.S. Dollar LIBOR reported rates show the frequency with which Defendants Bank of America, Citibank, HSBC, and JPMorgan reported within a given percentage rate from the fourth lowest quote. A negative difference means that they were below the fourth lowest quote, and therefore not included in the daily LIBOR calculation. Zero difference means that they either were the fourth lowest quote on a given day or tied at the same value as the fourth lowest quote (if there is a tie between LIBOR quotes on a given day, one of the banks' quotes is discarded at random).





69.     While bunching is reflective of Defendants' intention to report the lowest borrowing rate that would actually be used by Reuters in calculating LIBOR, *i.e.,* the fifth lowest borrowing rate, this does not suggest that the panel banks reporting the four lowest quotes (quotes that are discarded by Reuters) are not members of the conspiracy.  Due to the mechanics of LIBOR calculation, there will always be discounted outliers.  If all of the panel banks reported the same low rate, the lowest four would always be discounted.  Therefore by bunching quoted rates around the fourth lowest rate, the panel banks ensured the maximum downward manipulation.

### 3.     Defendants Had Significant Opportunity to Benefit from Manipulating LIBOR

70.     Defendants held significant financial positions in interest rate swaps for which their payment obligations were based upon LIBOR, thus providing them an opportunity to profit from suppressing LIBOR. It was no accident that Defendants experienced sharply increased profits in their interest rate swap positions at the time LIBOR fell – Defendants purposely took positions in interest rate swaps, which benefited from their suppression of LIBOR.

71.     A <u>Financial Times</u> article reports, for example, that Barclays is currently under investigation by the regulatory authorities of the United States and the United Kingdom for violating "Chinese Wall" rules which restrict information sharing between different parts of the bank. Barclays' Treasury Department submits its daily borrowing costs to the BBA and is required to be walled off from the bank's traders so as to avoid any influence. Barclays is being investigated regarding communications between its traders and its Treasury Department, which may have improperly influenced the daily submission process.

### III.     Governmental Investigations

72.     Defendants' conspiracy to manipulate LIBOR during the Class Period has spurred investigations by numerous government regulatory agencies into the reporting practices of various banks on the U.S. Dollar LIBOR Panel.

73.     The regulatory investigations were first publicly disclosed on March 15, 2011, when UBS disclosed in its annual report that it had received subpoenas from the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the United States Department of Justice, as well as an information request from the Japanese Financial Supervisory Agency, relating to its reporting of lending rates to Reuters for calculation of LIBOR. UBS's disclosure states that the focus of the investigations is "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times." Other Defendants have subsequently disclosed that they are subject to investigation by regulatory authorities related to LIBOR.  On August 1, 2011, for example, HSBC released its 2011 Interim Results and Barclays released its Half-Yearly Report in the United Kingdom, each disclosing that they were under investigation by various regulatory authorities around the world.  Barclays specifically identified investigations by the United Kingdom Financial Services Authority, the Commodity Futures Trading Commission, the Securities and Exchange Commission, the Department of Justice Fraud Section of the Criminal Division and Antitrust Division and the European Commission.  The Journal has reported that the investigators are looking into whether the banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

74.     A Financial Times article published the same day as UBS's disclosure reported that the three U.S. agencies, the Japanese Financial Supervisory Agency and the United Kingdom's Financial Services Authority had also requested information, and had begun interviewing witnesses connected to Defendants, for several months.

75.     On July 26, 2011, the <u>Financial Times</u> reported that investigators had expanded their probe to include Yen-based LIBOR and the Tokyo interbank offered rate ("TIBOR"). In its results announcement made that day, UBS confirmed that the investigation's scope had widened and disclosed that it had received "conditional leniency and conditional immunity" from the United States Department of Justice for turning over information on the setting of Yen-based LIBOR and TIBOR.  UBS stated that while its immunity stretched to the Yen-based LIBOR and TIBOR, the deal did not bar the Department of Justice or other "government agencies from asserting other claims against us."   The Antitrust Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity" and the policies protect leniency recipients from criminal conviction. Notably, each of the Defendants from 2006 to 2009 was a member of the Yen-based LIBOR Panel.

76.     Latham & Watkins LLP has observed that the coordinated antitrust investigations in the United States, EU, UK, and Japan indicate that the enforcers are cooperating with each other and that the antitrust investigations may have been triggered by one of the banks taking advantage of the Antitrust Division's Corporate Leniency Policy, as well as other leniency policies around the globe.

## **FRAUDULENT CONCEALMENT**

77.     By its very nature, the unlawful activity as alleged herein was self-concealing. Defendants, *inter alia,* conspired and engaged in secret and surreptitious activities in order to manipulate LIBOR.

78.     Defendants fraudulently concealed their participation in the conspiracy to manipulate LIBOR by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

79.     Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

80.     Defendants' actions in fraudulently concealing their illegal conspiracy caused the BBA, the organization that owns and administers LIBOR, to issue a number of statements defending the integrity of LIBOR.

81.     For instance, in a statement issued in May 2008, in response to published reports suggesting that Defendants had artificially suppressed LIBOR based upon decoupling of LIBOR from the CDS market, a BBA spokeswoman announced that there was "no indication" that the default-insurance market provides a more accurate picture of banks' borrowing costs than LIBOR.

82.     In June 2009, John Ewan, director of the BBA, represented that LIBOR was "not a false signal to the markets." Even as recently as March 2011, in response to UBS's disclosure that it was the subject of government investigations in connection with Defendants' suppression of LIBOR, the BBA issued a statement characterizing LIBOR as an "accurate and reliable benchmark[].""

83.     Plaintiff and members of the Class were lulled into believing that the returns on their LIBOR-based interest rate swaps were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

84.     Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff and members of the Class from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## DEFENDANTS' ANTITRUST VIOLATIONS

85.     Beginning at least as early as August 1, 2007, and continuing until at least the date of the filing of the Complaint, the exact dates being unknown to Plaintiff, Defendants and

their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress and stabilize LIBOR and thus the prices and rates of return on LIBOR-based interest rate swaps sold by them and on which they assumed the variable rate leg of the structure.

86.     In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress and otherwise make artificial the reported LIBOR rates.  This decreased the amount they would be required to pay to their customers, or increase the amount they would be entitled to receive from their customers, on the interest rate swaps that are the subject of this Class action complaint.  These activities included the following:

(a)     Defendants participated in meetings and/or conversations to unlawfully discuss their reporting of their borrowing rates to Reuters for calculation of the daily LIBOR;

(b)     Defendants agreed during those meetings and conversations to unlawfully and falsely report their borrowing rates to Reuters for calculation of LIBOR in order to drive down LIBOR and otherwise to depress or make artificial LIBOR; and

(c)     Defendants signaled to one another their intention to depress or otherwise make artificial LIBOR and colluded with one another in achieving this unlawful and anticompetitive purpose.

## ALLEGATIONS OF ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

87.     Defendants' conduct had both the effect of artificially setting the price that would be paid in the settlement or unwinding of interest rate swaps, by employing a collusively established false benchmark.   This conduct unreasonably restrained competition, understating the amount that Defendants should have been required to pay to their customers on the variable leg of interest rate swaps sold to them, producing unjust gains to Defendants and quantifiable pecuniary losses to their customers.  LIBOR was constructed and intended to be used, *inter alia*, as the basis for derivative products

24

including interest rate swaps.  Plaintiff and other Class members have, therefore, been injured in their business or property.

88.     The economic losses suffered by Plaintiff and other members of the Class occurred whether the interest rate swaps they purchased were held to term or were terminated early.  In 2007, the California Treasurers' Office published an article that discussed costs a municipality faces when considering whether to unwind the fixed rate counterparty position in an interest rate swap.  It noted that the cost of a fixed rate counterparty to unwind an interest rate swap increased if LIBOR did not increase as expected at the inception of the contract.

89.     With trillions of dollars worth of interest rate swaps referenced to LIBOR, even small changes in the LIBOR rate caused significant losses to Plaintiffs.

<u>**COUNT ONE**</u>

<u>**VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT**</u>

90.     Plaintiff incorporates by reference the preceding allegations.

91.     Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

92.     During the Class Period, Defendants controlled what LIBOR rate would be reported and therefore controlled the rates of return on interest rate swaps sold by them.

93.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and stabilized LIBOR and thus the moneys to be exchanged and rates of return on LIBOR-based interest rate swaps sold by them.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

94.     Defendants' conspiracy, and its resulting impact on the market for LIBOR-based interest rate swaps, occurred in or affected interstate and foreign commerce.

25

95.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property,

96.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

**COUNT TWO**

**UNJUST ENRICHMENT AND RESTITUTION**

97.     Plaintiff incorporates by reference the preceding allegations.

98.     It would be inequitable for Defendants to be permitted to retain the economic benefits they achieved from their manipulative acts and at the expense of Plaintiff and members of the Class.

99.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

100.    Alternatively or additionally, each Defendant should pay restitution of its own unjust enrichment to Plaintiff and members of the Class.

**RELIEF SOUGHT**

Accordingly, Plaintiff demands relief as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

C.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.     That Plaintiff and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

E.     That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

F.     That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: New York, NY
      October 28, 2011

SCOTT+SCOTT LLP

David R. Scott (DS8053)
Max R. Schwartz (MS2517)
Donald A. Broggi
500 Fifth Avenue, 40th Floor
New York, NY 10110
(212) 223-6444
(212) 223-6334 - Fax
drscott@scott-scott.com
mschwartz@scott-scott.com
dbroggi@scott-scott.com

Christopher M. Burke
Walter W. Noss
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
(619) 233-0508 - Fax
cburke@scott-scott.com
wnoss@scott-scott.com

K. Craig Wildfang
Stacey P. Slaughter
Christopher W. Madel
Thomas J. Undlin
ROBINS, KAPLAN, MILLER &

CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402-2015
(612) 349-8500
Kcwildfang@rkmc.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 687-6611
dmogin@moginlaw.com

*Counsel for Plaintiff*